# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

### Appeal No. 14-1146

### UNITED STATES OF AMERICA,
### Appellee

### v.

### HAGOP N. SARKISSIAN,
### a/k/a "Jack,"
### Defendant-Appellant

### GOVERNMENT'S RULE 27(c) MOTION
### FOR SUMMARY DISPOSITION

Pursuant to Rule 27(c) of the Local Rules of the Court of Appeals for the First Circuit, the government respectfully moves this Court to summarily affirm the Guidelines sentence imposed by the district court (Zobel, J., presiding). The defendant's claim that the district court failed to adequately consider the sentencing goals set out in 18 U.S.C. §3553(a) is procedurally defaulted. The district court, moreover, adequately explained the reason for its sentence. It clearly appears that no substantial question is presented, and summary disposition is warranted.

## RELEVANT FACTS

On August 23, 2012, the defendant was charged in a multi-count superseding indictment with (1) conspiring with various people from 2007 to April 20, 2011 to distribute various controlled substances (including 1,000 or more kilograms of

1

marihuana), in violation of 21 U.S.C. §846; and (2) conspiring from December 2010 to March 17, 2011 to use extortionate means to collect an extension of credit, in violation of 18 U.S.C. §894.   [App. 26].   At the time of his guilty plea (on June 3, 2013), the government explained that the defendant's involvement in the drug conspiracy was limited to marihuana; that it was not arguing that the statutory mandatory minimum applicable to 1,000 or more kilograms of marihuana applied (because it had not alleged that it was reasonably foreseeable to the defendant that the conspiracy involved 1,000 kilograms of marihuana, App.154)[1]; but that a heigh0tened statutory maximum applied.[2]   [App.115, 134].[3]

---

[1]*See United States v. Colón–Solís,* 354 F.3d 101, 103 (1st Cir. 2004) ("when a district court determines drug quantity for the purpose of sentencing a defendant convicted of participating in a drug-trafficking conspiracy, the court is required to make an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant").

[2]*See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (holding that, besides a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt").

[3]The government said that a life sentence applied, presumably because the indictment charged 1,000 kilograms of marihuana.   21 U.S.C. §841(b)(1)(A)(vii). But the defendant did not actually admit that the conspiracy involved 1,000 kilograms at his guilty plea.   He only admitted that he was personally responsible for a couple hundred kilograms.   [App. 134].   That admission (along with the indictment) made the 40-year statutory maximum for 100 kilograms or more of marihuana applicable to this case.   21 U.S.C. §841(b)(1)(B)(vii).   It also meant that the five-year statutory mandatory minimum for that quantity applied, *id.*, though the government said that no mandatory minimum applied to the case.   [App. 154].

The government explained that, as a result of a wiretap investigation, law enforcement officers determined that the defendant, who ran an auto shop in Newton, Massachusetts, was the drug customer of a major drug supplier (Vrej Jartidian) located in Canada. [App.122-124]. According to the government, three cooperating witnesses (Vartan Soukiasian, Thomas Hamilton, and Jeffrey Spinks) would testify that large quantities of marihuana were delivered to the defendant's business, stored in cars put on lifts, and later distributed. [App.124-125]. Safwan Madarati was also one of Vrej's customers. [App.125]. When one of the defendant's customers (Mark Cristofori) refused to pay him for marihuana that had been fronted, the defendant, Madarati, and two others (Sanusie Mo Kabba and Ronald Martinez) formulated a plan to get the money back. [App.125-126]. The plan involved both a verbal warning to Cristofori and a shooting into Cristofori's jewelry store. [App.126-127].

At the completion of the government's factual presentation, upon questioning by the court, the defendant admitted that he conspired to distribute marihuana, [App.132], and said that he was involved in distributing a couple hundred kilograms. [App.134]. He also admitted that he conspired with Madrati to collect a debt, that he threatened Cristofori, and that "threats were made explicitly or implicitly as to what would happen if he did not pay back the debt." [App.137-138].

3

Considerable evidence—set forth in the PSR[4] and during the trial of two

codefendants[5]—tended to establish that the defendant was not merely guilty of the

_____

[4]*See, for example,* PSR, ¶¶158 (Madarati stated that defendant received large quantities of marihuana from Canada); 160 (Madarati said that he agreed to assist the defendant in collecting the debt that Cristifori owed him); 176-177 (Spinks stated that, when a scheme proposed by the defendant to buy gold fell through, putting the defendant in debt to Spinks by "a couple hundred thousand dollars," the defendant offered Spinks marihuana); 177-178 (Spinks said he received multiple 100-pound shipments of marihuana from the defendant); 185 (Soukiasian said that Spinks was purchasing bulk amounts of marihuana from the defendant); 188 (Soukiasian said that Tommy Hamilton was the defendant's partner); 191-193 (Soukiasian said that the defendant fronted "JT" 150 pounds of marihuana and that JT failed to pay; that defendant went to speak to Cristifori; and that later the defendant's cousin said that things were going to "get ugly"); 197 (Hamilton stated that the defendant said he was going to sell marihuana to recoup money); *id*. (Hamilton agreed to facilitate a deal for the defendant); App.151 (government proffered that defendant's "own cousin, Arteen Sarkissian…told the entire story about [how he was the one responsible for the jewelry store shooting").

[5]During the trial of Ronald Martinez and Karapet Dzhanikyan on June 12, 2013, several witnesses implicated the defendant in the crimes with which he was charged. Thomas Hamilton testified that in 2008 or 2009, he started to conduct his car repair business out of the defendant's automotive shop in Newton, Massachusetts. [4:90-91]. It came to pass that he loaned the defendant a great deal of money [4:91]; the defendant was unable to pay it back and suggested that the two of them deal in marihuana. [4:100]. Hamilton facilitated two shipments of marihuana for the defendant [4:103 (picked up duffel bag of marihuana); 4:103-109 (brought 100 pounds of marihuana to defendant's business and put marihuana on lift). A significant portion of the larger shipment went to JT, who worked for Mark Cristofori, and who failed to pay for it. [4:99; 4:109-112].

Vartan Soukiasian testified that he was in the towing and transport business [4:126] and knew the defendant and his business partner, Tommy Hamilton [4:131]. In about 2010, Soukiasian began receiving distributable quantities of marihuana from the defendant, who stored marihuana in cars placed on lifts. [4:135-137]. That marihuana came from Canada, from an individual named Vrej. [4:139].

4

charged offenses but had a major role in them.   The defendant disagreed with this portrayal of himself.   First, the defendant denied "any allegation that he possessed a firearm at any time, ever or was complicit in anyone else possessing a firearm connected with this case in any respect."   [G.Add. 16, ¶27; *see also* G.Add. 14, ¶12].[6]   At sentencing, he acknowledged that he was intercepted saying that he was going to "take some action about collecting the debt owed by the Cristofori people," but denied that he was involved with a gun or had knowledge that a gun would be used.   [App.148-149; App.157].   Second, the defendant asserted that despite the mistake he made in becoming involved with a marihuana conspiracy during a 53-day period in 2011, he was not a major player.   [App. 155-157].   The government's witnesses, he claimed, were minimizing their roles at his expense.

---

Soukiasian had conversations with both the defendant and Hamilton about the 100-pound deal with JT, and learned that JT "robbed" them.  [4:143-144].  Shortly thereater, Soukiasian saw the defendant and his cousin (Arteen) with guns, and there was a shooting at Cristofori's jewelry store.  [4:145-146].  After the shooting, Soukiasian spoke with the defendant or his cousin, and asked them about the shooting; he was told that there was a message that they had to pass on.  [4:146].

[6]The defendant submitted objections to the PSR, but too late for them to be included in the PSR.  [App.147].  On the morning of sentencing, he forwarded those objections the court, with a cover letter that said that the only "material" objection was to the two-level gun enhancement.  [G.Add.12; *see also* App.147]. [As the objections were not filed electronically but sent to the district court directly, they were not previously available on PACER, and the government filed an assented-to motion to make them part of the record on appeal.  *See* D. 796. Although the district court has not ruled on that motion as of this date, the objections were attached to the government's motion (and, so, they are now available on PACER), and the defense had no objection to that motion.].

[App.157-161].  He was, rather, a different sort of person than as described by the government; he was "a good guy," "a very hard-working individual," with "absolutely no record," "a great father," and a devoted son who "is basically the sole custodian" of his elderly and unhealthy parents.  [App.155, 162-163].   In his sentencing memorandum, the defendant, invoking 18 U.S.C. §3553(a), asked for a sentence of five years.  [Add.1].  At sentencing, he asked for a sentence of less than five years.   [App. 149].

The government countered that multiple witnesses confirmed the defendant's involvement in obtaining large amounts of marihuana and in the shooting; that the defendant got several of these witnesses involved in the marihuana business; and that his attempts at minimization were mendacious. [App. 150, 168]. When he spoke, the defendant not only disclaimed his role as a ring leader, but also seemed to suggest that he had been roped into committing the crimes charged.     [App.169 ("A lot of it happened at my shop because Vartan Soukiasian had his trailer there); 169-170 ("And my cousin Arteen Sarkissian, I was in the car with him when he used to be on the phone with Officer Krol….If I knew I was doing anything wrong, I wouldn't be in those conversations or anything else.")].   The government asked for a 96-month sentence, a sentence at the high end of the applicable Guidelines sentencing range ("GSR") of 78 to 97 months.   [App. 154].

The court's ruling acknowledged that there might be some unclear aspects of the case, without saying what they were (whether the defendant knew that the cash-to-gold scheme would fail and deliberately involved people in a failing enterprise so as to lure them into the drug trade is one example of a feature of the case upon which the parties disagreed).   But, in its view, it was clear that the defendant committed two serious crimes, including the shooting of the jewelry store which had the potential of injuring or killing three people inside the store.   [PSR, ¶125].   The court imposed a sentence of 78 months, the low end of the applicable GSR.   This is what it said:

> What is clear in the record is that you pled guilty to two counts, one charging you with conspiracy to distribute marihuana in large amounts, and there's no dispute that the amounts were somewhere between 100 and 400 kilograms.

> And the second count is conspiracy to collect debt by extortionate means.   The second was clearly a violent offense.    It involved shooting into the jewelry store.….[I]t was a violent offense that could have been very dangerous and lethal, in fact.   It turned out not to be, I guess because whoever did it wasn't a very good shooter.

> In any event, those two things are clear.   You pled guilty to these two charges and the marihuana charge involved 100 to 400 kilograms, which you did not dispute, and those two charges under the Guidelines go exactly where the Guidelines are, 78 to 96 – or 97 months.

> My understanding of your role based on what you have placed on your plea and the evidence I heard at the

> trial has you involved rather more than [your attorney]
> would represent, and much can happen in 53 days.   So, I
> do not think that is such a very short time.
>
> In any event, I do believe that your participation in
> this was serious and dangerous, and that the Guidelines
> are not altogether wrong in this case.

[App.171-172].   Defense counsel asked the court to allow the defendant to
self-report to the United States Marshals Service [App.175], but did not object to the
sentence in any way.

## ARGUMENT

On appeal, the defendant claims that the district court committed a procedural
error in allegedly failing to adequately consider the 18 U.S.C. §3553(a) factors.[7]
*United States v. Millán-Isaac*, 749 F.3d 57, 66 (1st Cir. 2014) (a district court's
failing to consider the §3553(a) factors is a procedural error).   According to the
defendant, the district court's explicit reference to the crimes for which the

---

[7]Section 3553(a) provides that in imposing a sentence, a district court shall
consider, *inter alia:*   the nature and circumstances of the offense and the history and
characteristics of the defendant, §3553(a)(1); the need for the sentence imposed to
reflect the seriousness of the offense, to promote respect for the law, and to provide
just punishment for the offense, §3553(a)(2)(A), to afford adequate deterrence to
criminal conduct, §3553(a)(2)(B), to protect the public from further crimes of the
defendant, §3553(a)(2)(C), and to provide the defendant with needed educational or
vocational training, medical care, or other correctional treatment in the most
effective manner, §3553(a)(2)(D); the kinds of sentences available and the
applicable sentencing range and Guidelines policy statements, §3553(a)(3)-(5); the
need to avoid unwarranted sentencing disparity, §3553(a)(6).

8

defendant was charged evidences its failure to consider the other §3553(a) factors. The district court's explanation of its sentence was sufficient and, in any event, the defendant, who did not object to the district court's explanation, cannot demonstrate a reasonable probability that but for the district court's alleged error, he would have received a different, more favorable, sentence.

1.    *General principles and standard of review*.   The district court considers the §3553(a) factors after calculating the GSR and "giving both parties an opportunity to argue for whatever sentence they deem appropriate."   *Gall v. United States*, 552 U.S. 38, 49-50 (2007).   In considering whether the § 3553(a) factors supports a party's sentencing recommendation, the district court "may not presume that the Guidelines range is reasonable.…[It] must make an individualized assessment based on the facts presented."   552 U.S. at 50.   Then, "[a]fter settling on the appropriate sentence, [the court] must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing."   *Id.*   In the end, the sentence imposed must be supported by "a reasoned explanation" and constitute "a plausible outcome."   *United States v. Jiménez–Beltre*, 440 F.3d 514, 519 (1st Cir 2006) (*en banc*), *abrogated on other grounds*, *Rita v. United States,* 551 U.S. 338 (2007).

A district court is not "obligated to conduct an express weighing of

9

mitigating and aggravating factors or individually mention each §3553(a) factor." *United States v. Lucena-Rivera*, 750 F.3d 43, 54 (1st Cir. 2014). Instead, the court "ordinarily should identify the main factors on which it relies," *United States v. Arango*, 508 F.3d 34, 46 (1st Cir. 2007) (*citation omitted*), and the record must be enough to satisfy this Court that the district court "considered all of the applicable factors and viewed the [sentence] as sufficient to account for the defendant's individual circumstances." *Lucena-Rivera*, 750 F.3d at 54 (*citation omitted*).

The analysis is different when the defendant has not preserved his appellant claim, as happened here. That is, the defendant failed to alert the court to his belief that it had not considered the §3553(a) factors. The claim is therefore forfeited, and the plain error standard of review applies. *Millán-Isaac*, 749 F.3d at 66. Generally, to establish plain error, the "defendant must make four showings: (1) an error occurred, (2) that was clear or obvious, (3) that affected his substantial rights, and (4) that seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *Id., citing United States v. Olano*, 507 U.S. 725, 732–37 (1993). "A violation of §3553's mandates will warrant reversal under plain error review only if the defendant demonstrates a reasonable probability that, but for the error, the district court would have imposed a different, more favorable sentence." *United States v. Rodriguez*, 731 F.3d 20, 25 (1st Cir. 2013), *cert. denied,* 134 S.Ct. 1329

(2014) (*internal citation and quotation omitted*).

2.      ***The defendant cannot demonstrate that his sentence is plainly erroneous***.   As noted, the defendant claims that the district court failed to consider or mention the statutory factors set out in §3553(a), not that the sentence was substantively unreasonable.   According to the defendant, the district court merely "reiterate[d] the charges he pleaded guilty to and the dangerousness of Count 2," thus "flouting the injunction to consider the section 3553 factors and provide a reasoned, case-specific explanation for his sentence."   [Defendant's brief, pages 12-13].   The allegation is unavailing.

The district court's ruling directly responded to the defendant's attempt to minimize his involvement in the charged offenses, and it also addressed the court's particular concerns.   Specifically, the sentence addressed the seriousness and dangerousness of the offense, and the defendant's role in it, and the court's view that, given the circumstances, the GSR was appropriate.   Thus, the court explained its main reason for imposing sentence, as required.   *See Arango,* 508 F.3d at 46. *Cf. United States v. Batchu*, 724 F.3d 1, 13 (1st Cir.), *cert. denied*, 134 S.Ct. 663 (2013) ("All we require is that [a district court] specifically identify some discrete aspect of the defendant's behavior and link that aspect to the goals of sentencing.") (*citation omitted*).   Moreover, the considerations mentioned by the court are part

and parcel of §3553(a).  *See* §3553(a)(1) (court should consider the nature and circumstances of the offense); §3553(a)(2)(A) (court should consider the seriousness of the offense and the need for just punishment); §3553(a)(2)(B)-(C) (court should consider the need for general and specific deterrence); §3553(a)(4) (court should consider the GSR).  The court was not required to mention each §3553(a) factor.  *United States v. Ocasio-Cancel*, 727 F.3d 85, 91 (1st Cir. 2013).  And, given that it sentenced the defendant within the GSR, a lesser degree of explanation was needed than for a sentence falling outside the GSR.  *Cf. Arango*, 508 F.3d at 48 (context revealed that in sentencing the defendant to low-end of GSR, court was acknowledging the defendants' arguments for leniency).

The fact that the district court did not mention the mitigating factors proffered by the defendant (beyond rejecting the notion that the defendant had a minimal role) may be thought unfortunate because this appellate litigation has ensued, *see Lucena-Rivera*, 750 F.3d at 54 (dealing with a cursory explanation subject to plain error review), but is ultimately of no moment.   These factors were discussed in the PSR and in the defendant's sentencing memorandum.   [PSR, ¶¶238-240; G.Add.1]. The record evidences that the district court was generally familiar with the facts of the case and it may very well have taken the defendant's proffered mitigators into account when it sentenced the defendant to the low end of the GSR, despite the

government's high-end recommendation.  *See Lucena-Rivera*, 750 F.3d at 54 ("court's reference to a 'courtesy adjustment,' though imprecisely worded, was apparently a reference to his stature in his family and the community"); *cf. Arango*, 508 F.3d at 46-48 (although district court "gave no contemporaneous explanation at all" for its sentence, 508 F.3d at 46, "[t]he full context [of the proceeding] makes it apparent that, in sentencing the defendants to the lowest term of imprisonment within the [GSR]…, the court was acknowledging the defendants' arguments for leniency but rejecting their view that the §3553(a) factors warranted a sentence outside the standard range for the crimes they committed," 508 F.3d at 48);    *See also Jiménez–Beltre*, 440 F.3d at 519 (any gaps in the district court's reasoning can easily be filled by "comparing what was argued by the parties or contained in the pre-sentence report with what the judge did.").  That the district court did not explicitly mention the alleged mitigating factors in sentencing (beyond the defendant's role, that is) suggests that the court did not consider them as important as the aggravating factors, not that it did not consider them at all.  *United States v. Lozada-Aponte*, 689 F.3d 791, 793 (1st Cir. 2012) ("that the district court did not explicitly mention [mitigating circumstances] during the sentencing hearing suggests they were unconvincing, not ignored").  *See also United States v. Dixon*, 449 F.3d 194, 205 (1st Cir. 2006) (there is no requirement that a district court afford

each of the §3553(a) factors equal prominence).

In any event, even if there was some error, the defendant cannot establish a reasonable probability of a different outcome on remand. Nothing in the record suggests that the court would impose a different sentence if it were forced to go through, by rote, the §3553(a) factors. *Dixon,* 663 F.3d at 503 (district court not required to engage in "rote incantation" of §3553(a) factors).

## CONCLUSION

For these reasons, the government respectfully requests that the Court summarily affirm the sentence.[1]

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    /s/ *Dina Michael Chaitowitz*
DINA MICHAEL CHAITOWITZ
Assistant U.S. Attorney

---

[1]Should the Court determine that it cannot summarily dispose of this appeal, the government requests permission to file a responsive brief.

14

## Certificate of Service

I, Dina Michael Chaitowitz, hereby certify that on July 25, 2014, I electronically served a copy of the foregoing document on the following registered participants of the CM/ECF system:

Jeffrey A. Denner, Esq.
Denner & Associates, P.C.
Four Longfellow Place,
35th Floor
Boston, Massachusetts 02114

/s/ *Dina Michael Chaitowitz*
DINA MICHAEL CHAITOWITZ
Assistant U.S. Attorney

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

### Appeal No. 14-1146

### UNITED STATES OF AMERICA,
### Appellee

### v.

### HAGOP N. SARKISSIAN,
### a/k/a "Jack,"
### Defendant-Appellant

### <u>Addendum Table of Contents</u>

1.    Defendant's January 15, 2014 *Memorandum in Aid of Sentencing* (Docket entry 667) .......................................... G.Add.01

2.    Defendant's January 16, 2014 letter to the district court, forwarding objections (Docket entry 796) ............................ G.Add.12

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|
UNITED STATES OF AMERICA                  |
                           |
    v.                                                         |      **No. 1:11-cr-10195-RWZ-3**
                           |
HAGOP N. SARKISSIAN,                        |
                Defendant.       |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Hagop "Jack" N. Sarkissian ("Sarkissian" or "the defendant"), by and through his undersigned counsel, hereby respectfully submits this Memorandum to assist this Honorable Court in making a determination of the appropriate sentence. Nothing in this Memorandum is intended to excuse the conduct of the defendant; he realizes it is inexcusable, acknowledges responsibility, and apologizes. He pled guilty because he was guilty. He participated in the two conspiracies to which he pled guilty. He is not challenging the weight of marijuana attributed to him. Nor that he was involved in an extortionate conspiracy, but he exercises his right to tell this Court with more specificity what he actually did, and did not do. This Memorandum then, is being offered to assist this Honorable Court in properly placing the defendant, and his actual offense conduct within the context of 18 U.S.C. §3553(a) in order to fashion an appropriate sentence.

For the reasons set forth below, the defendant, requests that he be sentenced to a period of five years incarceration, an appropriate period of supervised release, the requisite special assessments, and a special condition that he receive a judicial recommendation to participate in the Bureau of Prisons Residential Drug Abuse Program ("RDAP") if found to be eligible, given

**G.Add.1**

the violent component of count 2-s, and to be designated to serve his time at an institution where the program exists. On behalf of the defendant, undersigned counsel respectfully suggests that this sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2), reflecting the seriousness of the offense, while promoting respect for the law, and providing a just punishment within the context of his offense conduct and consideration of his personal characteristics. Respectfully, the proposed sentence also has parity with the sentences imposed on the various co-defendants. This recommendation is predicated upon the mitigation provided by the defendant's personal history, characteristics, and state of mind at the time of the offense, all of which will be more fully discussed *infra*. Additionally, while his behavior was not "aberrant" as that term is understood in the U.S.S.G. model, it certainly represents a significant departure from the otherwise law-abiding life he had led. And, again, on his behalf, your undersigned counsel reiterate that the defendant assumes full legal and moral responsibility for the offense conduct contained in the indictment to which he has pled guilty.

## PROCEDURAL HISTORY

On April 20, 2011, a Complaint was filed in this Court alleging Hagop Sarkissian's involvement in a Conspiracy to Distribute Marijuana and a Conspiracy to Collect a Debt by Extortionate Means. That same day, an arrest warrant was issued, and he was taken into custody the next day, April 21, 2011, and an Initial Appearance was conducted. Sarkissian was held pending a detention hearing. The detention hearing was conducted over the course of two days, from April 27 to April 28. The defendant continued to be held while the Court took the matter

**G.Add.2**

under advisement.  On May 5, 2011, Sarkissian was released on an Appearance Bond and conditions.

On May 19, 2011, an eight count Indictment was filed charging Sarkissian with one count of Conspiracy to Distribute at least 1,000 Kilograms of marijuana, oxycodone, and cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B), and one count of Conspiracy to Collect a Debt by Extortionate means, in violation of 18 U.S.C. § 894(a).  He was arraigned on June 2, 2011, entered a plea of not guilty, and re-released on an Appearance Bond and conditions.

On August 23, 2012, an eleven count Superseding Indictment was filed charging the defendant with the same two counts previously alleged in the original Indictment.  On September 27, 2012, the defendant was arraigned, entered a plea of not guilty, and re-released on an Appearance Bond and conditions.

On June 3, 2013, the defendant changed his plea to guilty pursuant to Rule 11.  No plea agreement was entered into.  He was permitted to continue re-released on an Appearance Bond and conditions pending sentencing, which is scheduled for January 16, 2014.  Sarkissian has remained in compliance with his conditions of release.

A presentence investigation report ("PSR") was prepared by the U.S. Probation Department on December 12, 2013.  A revised PSR was provided by Probation on January 8, 2014.  The revised PSR suggests a TOL of 28 and an advisory guideline range of incarceration for 78 to 97 months.  As noted in the defendant's objections to the PSR, Sarkissian and undersigned counsel believe the correct TOL is 26 and guideline range 63 to 78 months.[1]  However, the defendant respectfully requests that the Court exercise its considerable discretion

---

[1] The defendant, in his PSR response, had opined that a TOL of 24 might also be appropriate, given his minimal role in the enterprise.  He withdraws this request.

**G.Add.3**

and impose a sentence below the advisory guideline range, specifically, a 60 months term of imprisonment followed by an appropriate period of supervised release with a judicial for a recommendation for designation to a facility with RDAP, contingent, of course, upon whether he will be eligible for same given his plea to count 2s.   The defendant contends that an analysis of the factors contained in 18 U.S.C. § 3553(a) supports his request for the below-guidelines sentence.

### **BACKGROUND OF DEFENDANT AND OFFENSE CONDUCT**

The defendant is a 49 year old single male living in a two family home in Watertown, Massachusetts.  His elderly parents, for whom he substantially provides care for, live in the other unit of the two family home.  He is the second of four children, and immigrated to the United States from Syria with his parents as a child, eventually becoming a U.S. citizen in 1978 at or about age fourteen.  The defendant attended, and graduated from Watertown High School.  He is the father of one (1) child, a son, who resides with his mother in California.  The defendant remains in contact with his son, and sends money to his mother when he can.  The defendant has supported himself since at least 1996 through automotive repair and sales at various shops/garages which he owned and/or operated.  While he has an arrest record, any and all related charges related to such incidents were ultimately dismissed or nol prossed, and he has no convictions.  Aside from the instant offense, he has been a law-abiding citizen seeking only to make a modest living for himself, and support for his family.  Prior to his arrest, he was engaged to be married.  However, knowing the potential consequences he faced, he made decision to end the engagement in the hope that his fiancée would be able to move on and not be unduly burdened by his situation.

4

**G.Add.4**

The defendant respectfully suggests that an appropriate application of 18 U.S.C. § 3553(a) factors to the circumstances herein should result in the sentence requested by the defense. The §3553(a) factors generally include (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide the defendant with needed educational or vocational training or medical care, (3) the kinds of sentences available, (4) the kinds of sentence and the sentencing range established by the United States Sentencing Guidelines, (5) any pertinent policy statement, (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (7) the need to provide restitution to any victim of the offense 18 U.S.C. §3553(a).

With regard to the United States Sentencing Guidelines, the district court, while not bound by them, still must consult and consider then when imposing sentence. *United States v. Booker*, 543U.S. § 20 at 264. Courts of Appeals cannot disturb a district court's sentence unless the appellate court finds that sentence unreasonable. *See id.* The United States Supreme Court clarified post-*Booker* sentencing procedure in *Gall v. United States*, 128 S. Ct. 586. The *Gall Court* indicated that when sentencing a defendant,

> [A] District court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one.

After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

128 S Ct. 596-597 (internal citations and quotation admitted). The Supreme Court re-emphasized the point stating. "[T]he sentencing court does not enjoy the legal presumption that the Guidelines sentence should apply." Nelson v. United States, 129 S. Ct. 890 (2009), quoting Rita v. United States, 551 U.S. 338, 127 S. Ct. 2456 (2007).

While the First Circuit has noted that sentencing courts must employ "an increased degree of justification commensurate with an increased degree of variance" from the advisory sentencing guideline range, it has also held that under a post-*Gall* rubric, "there is no stringent mathematical formula that cabins the exercise of the sentencing court's discretion. Indeed, after *Gall*, the sentencing inquiry-once the court has duly calculated the GSR-ideally is broad, open-ended, and significantly discretionary. At that point, sentencing becomes a judgment call, and a variant sentence may be constructed based on a complex of factors whose interplay and precise weight cannot even be precisely described." *United States v. Martin*, 520 F.3d 87, 91-92 (1ˢᵗ Cir. 2008) (internal citations and quotations omitted)(affirming a 91-month downward departure from the advisory sentencing guideline range).

In requesting this sentence, the defendant offers no excuses for his conduct. He knows and appreciates the wrongfulness of his actions and fully accepts responsibility therefor. He respectfully requests that this Court consider, and incorporate herein by reference, his objections to "The Offense Conduct" contained within the PSR.[2] While this Honorable Court may believe that the defendant is shirking responsibility for his involvement in the drug

---

[2] The only objection material to the TOL and advisory guideline level is contained in paragraphs 27 and 30 and relates to the (non)involvement of a dangerous weapon (gun). The defendant suggests that a TOL of 26, rather than 28, is appropriate.

**G.Add.6**

conspiracy by objecting to and/or denying many of the allegations contained within the PSR relates to offense conduct, the defendant is a man of pride and principle who cannot in good conscience admit to conduct in which he did not participate.  He agreed regrettably, to collect a drug debt for Madarati, he permitted marijuana to be stored in his shop, for his vehicle to be used to transport marijuana – he is part of the overall conspiracy and it was, or should have been, evident to him that the marijuana conspiracy involved in excess of 1000 kilograms of marijuana.    He facilitated both conspiracies. The defendant believes that was the worst decisions he has ever made in his life, but again, he takes full responsibility for them and accepts his punishment.  Ironically, rather than being the violent, aspiring drug dealer pictured by the array of cooperating witnesses who themselves are essentially auditioning for sentences measured in days or months, rather than in years, he has no history of drugs, violence, and only knew Madarati for a total of approximately 50 days - unlike the cooperating witnesses receiving significant leniency who were figuratively in bed with Madarati for years.

While the defendant respectfully suggests (and did suggest in his PSR Response) that the Court would be justified in adjusting his GSR downward for his minor role in the conspiracies pursuant to USSG § 3B1.2, he is not actually requesting it do so-rather simply to recognize, in the overall, § 3553(a) analysis, that his culpability is equal or less than most of the other codefendants as well as perpetrators of comparable crimes.  *See United States v. Mateo-Espejo,* 426 F.3d 508, 512 (1st Cir. 2005).   Again, interestingly, only the cooperating witnesses identify Sarkissian as being at the center of this drug enterprise. There is virtually no other corroboration of this level of involvement by him.  It is only in their self-serving statements that Sarkissian is allegedly repeatedly handled drugs or weapons.  In truth, his co-conspirators had far more extensive and/or managerial involvement, including masterminding and/or carrying

**G.Add.7**

out the scheme and its ongoing operation.  Sarkissian's sin was presumably in allowing it to proceed in his midst with his tacit assistance, and by essentially providing a base of operations at different times.  Even a defendant who has performed a "limited function" similar to that of "a defendant who is convicted of a drug trafficking offense whose role in that offense was limited to transporting or storing drugs" has been found eligible for a minor role adjustment.  *See United States v. Munoz Franco*, 356 F. Supp. 2d 20 (D.P.R. 2005).  And the sentences already imposed in this case - Vartan Soukassin  - 30 days BOP,  3 months (of 2 year Supervised Release) in Home Dentention; Antranic Idanjian  - 3 years probation; Robert Johnson – time served (7 day) plus 4 years Supervised Release; Jeffrey Sprinks – 30 days BOP, 3 months Home Detention (of 2 years Supervised Release); Victor Loukas – 1 year and 1 day BOP, 3 years Supervised Release; and many others who generally pleaded to the cocaine and oxycodone components of the conspiracy and whose cases/sentencing are pending.  These were all collectively, the people who quite literally "made out like the bandits" they actually were.

In short, it is clear that Madarati effectively was the manager, who, with others, truly manipulated Sarkissian.  Sarkissian very rarely comes up on any intercepted phone calls.  And again, he only even knew Madarati for approximately fifty days – less than two months.  All while he stands before this Court faced with a five year mandatory minimum sentence, several of his co-conspirators, above,  who have pled guilty to the same Count 1 of the original or Superseding Indictment pursuant to plea agreements, as noted above, have avoided the mandatory minimum sentence, and were sentenced to anywhere from time served of three days, seven days, thirty days, to one year and one day, and up to forty-two (42) months,[3] because they were intimately involved in the conspiracy and had information to trade.  Sarkissian on the other hand, did not meet Madarati until late February 2011 and was arrested April 21, 2011.  He was a

---

[3] It is noted that Madarati has recently been sentenced to 144 months.

**G.Add.8**

member of the conspiracy that spanned years for a mere fifty-some-odd days. He had no information to trade because, unlike his co-conspirators, he was a minor player.

Given that his co-conspirators were given such lenient sentences in the face of a five year mandatory minimum, albeit as the result of plea agreements that surely involved 5k1.1 departures, Sarkissian should arguably face a sentence only slightly longer than such co-conspirators; §3553(a)(6), calls for the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct. Sarkissian, previously having been an otherwise law-abiding citizen, has no record. Yet because he had no information to trade faces a very disparate sentence compared to that of many of his co-conspirators. He accepts this reality, and understands his own mistakes that have led him to this fate. However, in light of the foregoing, the defendant respectfully suggests that the Court should not sentence him to even a day beyond the required five year mandatory minimum.

The defendant wishes the Court to consider that, under the circumstances, the sentence requested by the defense is, in fact, sufficient to meet the purposes prescribed by 18 U.S.C. §3553(a)(2). A felony conviction, particularly to a man such as the defendant, a proud man, who is deeply tied to a proud immigrant community, is a terrible burden that he will have to answer for, in various contexts, for the rest of his life. Thus, there is a general deterrence in the sentence as the message is sent that violating the law will be punished with substantial consequences, loss of liberty, reputation, and separation from loved ones. Specific deterrence already has been met as the defendant came to realize the devastating impact his behavior has had, not only upon him, but also upon his family, particularly his elderly and infirmed parents for whom he cares, his child whom he supports, and his now ex-fiancé. The public is not in need of protection from the defendant – despite his co-conspirators' self-serving allegations –

**G.Add.9**

he is not aggressive, violent or prone to harm anyone, and not a risk to re-offend. The requested sentence is sufficient, but not greater than necessary, to comply with the purposes set forth in the 18 U.S.C. §3553(a)(2).

In fact, the First Circuit has summarized the central principles of the post-Booker and *Gall* sentencing procedure described above, as follows:

> In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent of that they are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court "should consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."

*United States v. Martin*, 520 F. 3d 87, 91 *(1st Cir. 2008) (quoting Gall, U.S. at 52).*

Lastly, the defendant requests that in fashioning his sentence, this Honorable Court take into account the defendant's elderly and infirmed parents. Every day beyond the five year mandatory minimum which this Court sentences Sarkissian is another day through which his parents will have to struggle without the support of their son, on which they have come to rely upon almost completely for daily needs. Far more troubling for Sarkissian, is that every day he is away from them increases the chances that he will never see them again.

For the foregoing reasons, Hagop "Jack" Sarkissian respectfully asks the Court to impose the requested sentence of five years followed by an appropriate term of Supervised Release. In light of the facts and circumstances of the offense conduct and of this defendant, the proposed sentence is sufficient, but not greater than necessary, to comply with the purposes

**G.Add.10**

set forth in the statute at 18 U.S.C. §3553(a)(2) and it is the most fair and just resolution of the competing demands facing the Sentencing Court. This is particularly true, where as here, a conviction for count 2-s will, because of the "violence" attributed to a Conspiracy to Collect a Debt by Extortionate means, likely result in disqualification for certain BOP programs (eg. 500 hours RDAP Substance Abuse Program) and very well result in a higher security classification and placement.

Dated: January 15, 2014      Respectfully submitted,
HAGOP N. SARKISSIAN
By and through his attorneys,

  /s/ *Jeffrey A. Denner*
Jeffrey A. Denner, BBO#120520
DENNER♦PELLEGRINO, LLP
Four Longfellow Place, 35th Floor
Boston, Massachusetts 02114
Tel.   617.227.2800
Fax.   617.973.1562
jdenner@dennerpellegrino.com

**Certificate of Service**

I, Jeffrey A. Denner, hereby certify that on this the 15th day of January 2014, I caused a true copy of the foregoing *Defendant's Memorandum in Aid of Sentencing* to be served upon all necessary parties to this matter by virtue of electronically filing the same via the CM/ECF system.

  /s/ *Jeffrey A. Denner*
Jeffrey A. Denner

**G.Add.11**

# DENNER♦PELLEGRINO, LLP

### COUNSELLORS AT LAW

January 16, 2014

**VIA EMAIL**

Judge Rya W. Zobel
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts, 02210

Re:    **United States of America v. Hagop P. Sarkissian**
       **Docket No. 1:11-cr-10195-RWZ-3**

Dear Judge Zobel,

Per USPO Richard Rinaldi's direction after he received my PSR response yesterday, I am filing the PSR response directly with you.

While it is an extensive response, the only objection that materially relates to the TOL/GSR are where we are suggesting a TOL of 26 rather than 28 because the defendant was not involved in the possession of a dangerous weapon (¶210) per §2D1.1(b)(1). I did not consider the rest of the objections material to establishing the advisory guideline range.

I received the Government's Sentencing Memorandum yesterday and have filed our own as well yesterday. My understanding is that same has already been electronically filed and is available to you.

Very truly yours,

Jeffrey A. Denner

cc:    Neil Gallagher, AUSA
       Richard Rinaldi, USPO

# DENNER ◆ PELLEGRINO, LLP

### COUNSELLORS AT LAW

January 15, 2014

Richard Rinaldi
Sr. U.S. Probation Officer
United States District Court
One Courthouse Way, Suite 1200
Boston, Massachusetts 02210

**Re:**    **United States v. Hagop N. Sarkissian**
        **No. 1:22CR10195-03-RWZ**

Dear Mr. Rinaldi:

Defendant Hagop "Jack" N. Sarkissian, by and through undersigned counsel, respectfully submits the following objections to the revised Presentence Investigation Report ("PSR") provided to the parties on January 8, 2014:

1.    Mr. Sarkissian objects to the reference in Paragraph 85 pertaining to him. Upon information and belief, Mr. Sarkissian did not make the acquaintance of Safwan Madarati ("Madarati") until late February 2011, over two (2) months after the December 18, 2010 date referenced in Paragraph 85.

2.    Mr. Sarkissian objects to any inference in Paragraph 86 that he is the "Jack" referenced therein. As stated above, Mr. Sarkissian did not make the acquaintance of ("Madarati") until late February 2011. Upon information and belief, the reference to "Jack" contained in Paragraph 86 is an alias of, and pertains to, Vrej Jartidian ("Jartidian"), not Hagop Sarkissian.

3.    Mr. Sarkissian objects to Paragraph 89 on the same grounds as those raised above as to Paragraphs 85 and 86. Paragraphs 91, 92, and 179 reinforce that any reference to "Jack" actually is a reference to Jartidian, who, on information and belief, had known Madarati for several years, whereas Mr. Sarkissian had yet to make his acquaintance.

4.    Mr. Sarkissian objects to Paragraph 92 on the same grounds as those raised above as to Paragraphs 85, 86 and 89.

5.    Mr. Sarkissian objects to Paragraph 119 in that it is imprecise and unclear, suggesting an inference that Mr. Sarkissian was still present in the Land Rover at the time the occupants of the Land Rover and the Sebring interacted. Mr. Sarkissian had left the Land Rover in the custody of Madarati and parted company with him prior to any meeting with the occupants of the Sebring. This contention is supported in Paragraph 120, which notes that Madarati, not Mr. Sarkissian, was operating the Land Rover, and returned it to Newton Automotive.

DENNER ◆ PELLEGRINO, LLP

COUNSELLORS AT LAW

6.   Mr. Sarkissian objects to the allegation in Paragraph 122 that he made any representations to Madarati and/or devised a plan with him with regard to any marijuana payments or the recovery thereof, and denies the same.

7.   Mr. Sarkissian denies that he knew of the plan to "shoot up" Cristofori's jewelry store or that he travelled there or to Cristofori's residence for the purpose of confirming the location for any such shooting(s), though he admits that he answered in the affirmative when Mr.Madarati told him to go Cristofori's to collect a drug debt (see below)

8.   Mr. Sarkissian denies the allegations contained within Paragraph 126 as to requesting that Madarati give marijuana to Kabba and Martinez for payment for the shooting, or that he took $50,000 to Florida. Mr. Sarkissian was not aware of the plan for the Cristofori shooting, or the execution of the plan until after it had occurred. Mr. Sarkissian admits that he travelled to Florida, but did so for legitimate business purposes. Moreover, Mr. Sarkissian was not involved in the planning and/or execution of the Cristofori shooting nor did he have   prior knowledge of it.   However, as previously mentioned independently of the actual planning and execution of the shooting he had agreed with Madardit that he would attempt to collect the drug debt for Madarati.

9.   Mr. Sarkissian objects to the reference contained in Paragraph 156 as to "$160,000 [to be collected] from Sarkissian" in that Mr. Sarkissian denies that any such money was his or collected from him. Rather, on information and belief, the referenced $160,000 was likely the property of, and collected from, Vartan Soukiasian ("Soukiasian"). On information and belief, Artine Sarkissian has known Soukiasian for eight (8) to ten (10) years.

10.  Mr. Sarkissian denies the allegation contained in Paragraph 158 that he received marijuana from Jartidian, and believes that it was Soukiasian that received marijuana from Jartidian.

11.  Mr. Sarkissian denies the allegation contained in Paragraph 159 that he traveled to Florida to extort anyone. Mr. Sarkissian travelled to Florida to address his legitimate scrap gold dealing business with Kevork Apkarian ("Apkarian"). On information and belief, Apkarian was planning to leave for Canada long before meeting with Mr. Sarkissian.

12.  Mr. Sarkissian objects to the allegations contained in Paragraph 160. Mr. Sarkissian asserts that it was Madarati that requested his assistance in collecting a debt from Cristofori's. Mr. Sarkissian admits that he agreed to go to Cristofori's to attempt to collect the debt on behalf of Madarati. Mr. Sarkissian went to Cristofori's with his cousin, Artine Sarkissian to attempt to collect the debt, a decision he greatly regrets. However, Mr. Sarkissian denies that he was ever a part of a plan to "shoot up" Cristofori or his store, nor did he ever agree to pay Kabba or Martinez.

2

**G.Add.14**

DENNER ❖ PELLEGRINO, LLP

COUNSELLORS AT LAW

13. Mr. Sarkissian objects to the characterization of his legitimate gold business referenced in Paragraph 176 as a "scheme."

14. Mr. Sarkissian denies the allegations contained in Paragraph 177, and submits that, on information and belief, Soukiasian, not Sarkissian, was the one who offered marijuana to Spinks, told him of a source of supply, and negotiated prices. Mr. Sarkissian did not participate in the transactions referenced in Paraagraph 177.

15. Mr. Sarkissian denies the allegation contained in Paragraph 178 that any shipments of marijuana were provided to or by him herein. On information and belief, Soukiasian, not Sarkissian, was the one who supplied marijuana to Spinks. Moreover, Mr. Sarkissian submits that, as in Paragraphs 86, 89, and 179, "Jack" refers not to Mr. Sarkissian, but rather to Jartidian.

16. Mr. Sarkissian denies the allegation contained within Paragraph 183 that he had a conversation with Soukiasian about setting up a source of supply for high-grade marijuana. No such conversation about supplying drugs ever occurred between the two.

17. Mr. Sarkissian denies the allegation contained within Paragraph 184 that he was supplied with marijuana by Jartidian, and that he in turn supplied Soukiasian with marijuana to distribute on his behalf. On information and belief, it was Soukiasian who received marijuana from Jartidian, and distributed it on his own behalf. Mr. Sarkissian denies receiving marijuana and/or "stashing" it at Madarati's home.

18. Mr. Sarkissian denies the allegation contained in Paragraph 185 that he was providing marijuana to Spinks. Moreover, he submits, that on information and belief, it was Soukiasian, not Mr. Sarkissian, who supplied Spinks with marijuana.

19. Mr. Sarkissian denies the allegations contained in Paragraph 186 that he provided marijuana to Soukiasian, or arranged for Soukiasian to make money pick-ups or drop-offs. Rather, Mr. Sarkissian submits that, on information and belief, any such marijuana was distributed by Soukiasian on his own behalf or at the behest of Madarati, and that any transportation of money was likewise on Soukiasian's own behalf or at Madarati's behest.

20. Mr. Sarkissian denies the allegation contained in Paragraph 187 that he was in possession of a firearm. Mr. Sarkissian vigorously asserts that he has never handled a gun, let alone carried or owned one at any time.

21. Mr. Sarkissian asserts that, upon information and belief, any marijuana referenced in the allegations contained in Paragraph 188 belonged to Tommy Hamilton, not Mr. Sarkissian.

3

**G.Add.15**

# DENNER ✦ PELLEGRINO, LLP
## COUNSELLORS AT LAW

22.   Mr. Sarkissian denies all of the allegations contained in Paragraph 189. Further, Mr. Sarkissian asserts that he doesn't even know Johnson.

23.   Mr. Sarkissian denies the allegation contained in Paragraph 191 that he agreed to get marijuana for JT, or ever provided marijuana to JT. Moreover, Mr. Sarkissian asserts that JT repeatedly attempted to extort money from him.

24.   Mr. Sarkissian denies the allegation contained in Paragraph 192 that he ever possessed a gun.

25.   Mr. Sarkissian asserts that he has no recollection of participating in any such meeting as described in Paragraph 193.

26.   Mr. Sarkissian denies the allegations contained within Paragraph 197.

27.   Mr. Sarkissian asserts that the two (2) point increase to his Base Offense Level ("BOL") pursuant to § 2D1.1(b)(1) for the involvement of a dangerous weapon, specifically a firearm, in the offense is inappropriate. As noted above, Mr. Sarkissian denies any allegation that he possessed a firearm at any time, ever or was complicit in anyone else possessing a firearm connected with this case in any respect. As such, the two (2) point increase should be discounted, resulting in a BOL of 26.

28.   Mr. Sarkissian wishes to supplement the information contained in Paragraph 233. Specifically, he would like to note that his father had to have a hip replacement and continues to struggle with his recovery. Mr. Sarkissian continues to be his father's primary source of transportation to the doctor for ongoing treatment, as well as providing groceries and help around the house.

29.   Mr. Sarkissian wishes to supplement the information contained in Paragraph 234. Specifically, he would like to note that his mother has developed problems with her heart. Mr. Sarkissian continues to be his mother's primary source of transportation to the doctor for ongoing treatment, as well as providing groceries and taking care of both parents at th home.

30.   Mr. Sarkissian objects to the Guideline Provision calculation contained within Paragraph 254, and asserts that, properly discounting the two (2) point increase under § 2D1.1(b)(1), the resulting BOL of 26 and criminal history category of I results in a guideline imprisonment range of 63 – 78 months (rather than 78 – 97 months).

**G.Add.16**

DENNER ✦ PELLEGRINO, LLP

COUNSELLORS AT LAW

Mr. Sarkissian will provide further detail regarding each of these points in his forthcoming sentencing memorandum. If you have any questions regarding these objections, please do not hesitate to contact me at (617) 227-2800.

Sincerely,

Jeffrey A. Denner

Cc:     Neil J. Gallagher, Jr., AUSA
        Michael I. Yoon, AUSA
        United States Attorney's Office
        1 Courthouse Way, Suite 9200
        Boston, MA 02210

5

**G.Add.17**